NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>ANTHONY SUAREZ and VINCENT TABBACHINO,<br><br>                Defendants. | Criminal Action No.: 09-932 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

      Currently before this Court is a Motion filed by Defendants requesting, inter alia, that as a result of the Government's failure to produce certain electronic text messages related to its investigation of Defendants the Court either suppress related evidence or issue an adverse inference instruction. The Court conducted hearings and heard counsel's arguments regarding the "missing" text messages on July 27, 2010, September 29, 2010, and October 8, 12, and 15, 2010.

**I. Background**

      In 2008, federal law enforcement authorities began using Solomon Dwek as a cooperating witness to investigate public corruption within the state of New Jersey. The cooperating witness held himself out to be real estate developer David Essenbach and claimed to be interested in developing the greater Hudson and Bergen County, New Jersey, areas. Agents within the Federal

Bureau of Investigation (F.B.I.) instructed the cooperating witness to express interest in such development to local public officials and offer these officials payments in exchange for expediting his projects and providing other official assistance.  During the period from March to July, 2009, the cooperating witness, posing as developer David Essenbach, spoke and met with the defendants herein on multiple occasions.  During the relevant time period of the investigation pertaining to the defendants herein and during meetings with said defendants, the cooperating witness exchanged numerous Short Message Service electronic communications ("text messages") with F.B.I. Agents William Waldie, Donald Russ, and Sean McCarthy.

      In December 2009, Defendants made their first request for discovery of the text messages exchanged between the cooperating witness and the F.B.I. agents.  Receiving no response, Defendants moved on June 16, 2010 for the Government to produce the text messages.  The Court held oral argument on July 27, 2010.  At oral argument, the Government indicated that it would produce the text messages.  (Oral Argument Tr. 26:22-27:4, July 27, 2010.)

      Subsequently, in a letter to Defendants dated August 31, 2010, the Government stated that it was unable to produce any of the text messages sent by the cooperating witness to the agents because the witness had used a personal cellular telephone, and his wireless carrier "retained text messages for a period of only 3 to 5 days from the date of creation."  Defs.' Mot. in Limine Ex. D.  The Government further stated that it could not produce text messages sent by Agents Waldie, Russ, or McCarthy to the cooperating witness during the time period of March 1, 2009 through March 16, 2009, nor could it produce any text messages sent by Agents Russ or McCarthy during the entire month of July 2009.  Id.  The Government explained that this was because "the FBI retained text messages of its agents only for so long as limited storage space on

its servers allowed." Id.

The following month, however, the Government did in fact produce text messages from Agent Waldie for the time period from March 1 through 16, 2009. The Government still did not produce any text messages from Agents Russ or McCarthy for either of the relevant time periods. On September 21, 2010, Defendants made the present Motion, and oral argument was held on September 29. At oral argument, the Government confirmed that it had produced text messages from other time periods, including May 2009, but represented to the Court that no text messages existed for Agents Russ or McCarthy for the March and July time periods. The Government offered the following explanation:

> THE GOVERNMENT: We do not believe -- have no reason to believe that any text messages are missing. We made a misstatement in our view to counsel that in fact the period of time in our review of the [text messages] show that there were no [text messages] in March for Agents Waldie, Russ and McCarthy. We have since found Agent Waldie's and produced to the defendants all of Agent Waldie's texts for March. We also stated that in July, there was a period of July where we thought there were no [text messages] for McCarthy and Donny Russ, and we learned at least for some periods during that time, both were on --
>
> THE COURT: McCarthy and Russ were on vacation.
>
> THE GOVERNMENT: -- correct.
>
> * * *
>
> THE COURT: Well, what is your representation to this Court regarding the March text messages?
>
> THE GOVERNMENT: We do not believe that any text messages are missing. We have no reason to believe that.

(Oral Argument Tr. 94:22-96:4, Sept. 29, 2010.)

After oral argument, the Government notified the Court that these statements were made

in error.  The Government now maintains that Agent Russ and Agent McCarthy were <u>not</u> on vacation during July 2009 and that text messages were in fact sent by those agents to the cooperating witness during the relevant time periods.

## II. Text Message Hearings

As a result of the lack of information regarding the exact cause and circumstances surrounding the retention and deletion of the aforesaid messages, the Court ordered a hearing.  Said hearing was held on October 8, 12, and 15, 2010.  The three F.B.I. agents who communicated with the cooperating witness over text message, Agents Waldie, Russ, and McCarthy, each testified.  The agents were asked to describe the contents of the text messages and to indicate whether they had personally attempted to preserve the messages.  Each agent testified that he had deleted the messages from his handheld Blackberry® device.  One of the reasons given was a fear of overloading the device's local persistent memory.  (Trial Tr. 6.12:2-16, 6.52:2-12, 6.100:16-6.101:17, Oct. 8, 2010 [hereinafter "Hr'g. Tr."].)  Each agent testified that he was never instructed to preserve text messages.  (Hr'g. Tr. 6.16:3-6, 6.45:22-6.55:5, 6.102:11-20.)  The agents also testified that on occasion they did give instructions to the cooperating witness via text message and that the witness did relay to them the witness's interpretation of what was said during the meetings.  (Hr'g. Tr. 6.25:15-6.26:3.)  The agents, however, testified that said interpretation was irrelevant because the meetings were audio and video recorded.  (Hr'g. Tr. 6:14:12-22, 6.50:12-6.51:22.)

The first witness, Agent Waldie, testified as to the conditions under which he would document events or conversations that occurred during a meeting that was being recorded by a cooperating witness: "If it was something that couldn't be heard or seen, yes.  But if it was

something that was said, no. The tape would capture that." (Hr'g. Tr. 6.14:17-22.) As Agent Waldie finished his testimony, an Assistant United States Attorney left the courtroom and spoke with Agent Russ, who had been sequestered, as he had not yet testified, and was waiting in hallway. An attorney for Defendants followed the Government attorney into the hallway. When questioned by the Court about the substance of the conversation, both the Assistant United States Attorney and Agent Russ explained that the attorney was merely attempting to remind Agent Russ of what they had previously discussed during witness preparation, specifically that the meetings between the cooperating witness and Defendants had been recorded and that any conversations described in any text messages would be preserved in the recording. (Hr'g. Tr. 6.42:22-24, 6.64:7-20.) This was in violation of a Sequestration Order entered by this Court. The Court takes violations of its Orders very seriously, and although the conversation with Agent Russ appears to have pertained to a matter of small importance in the context of the hearing, the Court nevertheless admonished the attorney in question and made it clear that the Court was troubled by his actions.

After the F.B.I. agents testified, the Court heard testimony from three F.B.I. information technology specialists regarding the procedures that the agency uses to preserve and retrieve data generated by the agents' handheld devices. Rodrick Summers, the F.B.I.'s Information Technology Unit Chief, testified as to how the F.B.I. preserves text messages sent by its agents. He stated that when an agent sends a text message from his government-issued handheld device, the message is first transmitted to a commercial wireless carrier via the carrier's cellular tower infrastructure. (Trial Tr. 7.12:17-7.14:19, Oct. 12, 2010 [hereinafter "Hr'g. Tr."].) Then, the commercial carrier routes one copy of the message to the designated recipient (again, via the

commercial cellular tower infrastructure) and routes another copy of the message to a server maintained by Research in Motion Limited (RIM). (Hr'g. Tr. 7.8:14-23, 7.15:2-7.16:23.) The RIM server then transmits the message to one of a number of Blackberry® Enterprise Servers (BES) maintained by the F.B.I. at its Clarksburg, West Virginia, facility. (Id. at 7.9:10-12.) During the time period relevant to this case, the F.B.I. maintained fourteen BES servers. (Id. at 7.9:7-9.) After a text message leaves an agent's handheld device and until it reaches a BES server, the message is handled entirely by non-government entities. (Id. at 7.15:24-7.16:2.)

     Mr. Summers testified that the BES servers contain only a few days of text message data at any given time, but they are backed up to a "log server" on a daily basis. (Id. at 7.23:3-4.) The BES server data is also backed up daily to a series of "backup tapes." (Id. at 7.25:1-9.) The log server and backup tapes are all located in Clarksburg, West Virginia. (Id. at 7.11:13-15.) Mr. Summers testified that absent a litigation hold, F.B.I. policy permits that after a period of 90 days the backup tapes may be overwritten or destroyed, and log server data may be deleted. (Id. at 7.25:1-19.) No litigation hold was in place during the time period in which the missing text messages were sent, nor was a litigation hold in place during the 90 day period following that time. The Government first ordered a litigation hold on or about January 11, 2010. (Id. at 7.39:9-13.)

     At the hearing, the Government produced an F.B.I. Corporate Policy Directive that provided both the data retention policy of the F.B.I. and its policy regarding litigation holds. (Text Message Hr'g. Ex. 3 [hereinafter "Hr'g. Ex."].) This document contains the 90 day retention period described in Mr. Summers' testimony and further indicates that "[l]itigation holds or other special inquiries are the only exceptions to this data backup policy. In these

instances, backups must be maintained until resolution of the litigation or other inquiry." (Id.) The document further indicates that this exception extends to "reasonably anticipated or pending litigation." (Id.)

Brian Modest, a security engineer contracted by the F.B.I., described his efforts during October through December 2009 to retrieve from the F.B.I. servers the text messages from the missing periods described above. (Hr'g. Tr. 6.131:7-11.) Mr. Modest testified that he used a computer tool to transfer data from the log servers onto his own database, from which he conducted keyword searches. (Id. at 6.124:6-6.125:23.) Mr. Modest testified that he was unable to locate the missing text messages, even through a manual search. (Id. at 6.141:3-14.)

Justin Grover, a information security engineer with the F.B.I.'s Enterprise Security Operations Center (ESOC), testified about an audit performed by ESOC staff in an effort to locate the missing text messages. (Id. at 6.149:16-25.) Mr. Grover indicated that he personally performed the same audit again on October 1, 2010. (Id. at 6.150:15-21.) Mr. Grover testified that ESOC maintains a separate database of text message data from the ones described by the other witnesses. On a daily basis, ESOC transfers text message data from the BES servers through an intermediary server and onto ESOC's "classified analytical network." (Id. at 6.147:21-6.148:1.) The classified analytical network maintains text message data back to November 2007. (Id. at 6.147:7-18.) Mr. Grover testified that if information never resided on the BES servers, it would not be found on the classified analytical network maintained by ESOC. (Id. at 6.125:5-8.) None of the witnesses were able to explain why some text messages from the same time period were preserved while others were apparently deleted. Likewise no reasonable explanation was offered as to why there was a need to place a litigation hold on text message data

in January of 2010, yet no need to do so prior to that time.

### III. Discussion

The Government has no "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. 97, 111 (1976). In contrast to the breadth of discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure "delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." United States. v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994). In general, this "additional material" is limited to material discoverable under the Jencks Act and under Brady v. Maryland, 373 U.S. 83 (1963). Id. Therefore, before deciding whether sanctions are warranted for the Government's failure to produce the missing text messages, the Court must determine whether those text messages fall under Rule 16 or whether they constitute Jencks or Brady material.

A.  Whether the Text Messages are Discoverable

Federal Rule of Criminal Procedure 16(a) outlines the Government's basic disclosure requirements. Most pertinent to the facts of this case is Rule 16(a)(1)(E), which provides that "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data . . ., if the item is within the government's possession, custody, or control and (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). However, Rule 16(a)(2) clarifies that this rule does not "authorize the discovery or inspection of statements made by prospective

government witnesses except as provided in 18 U.S.C. § 3500 [the Jencks Act]." Fed. R. Crim. P. 16(a)(2). Since the text messages at issue in this case were sent between F.B.I. agents and the cooperating witness, they were statements made by "prospective government witnesses." The Court must therefore determine whether production of the text messages is required by the Jencks Act.

The Jencks Act and Federal Rule of Criminal Procedure 26.2[1] require the Government to disclose prior recorded statements of its witnesses after they testify. 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2. The purpose of the Jencks Act and Rule 26.2 is to permit defense counsel to have the materials necessary to impeach a Government witness. United States v. Rosa, 891 F.2d 1074, 1076-77 (3d Cir.1989) (citing Jencks v. United States, 353 U.S. 657, 667, 77 (1957)). Rule 26.2 provides in relevant part:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Fed. R. Crim. P. 26.2(a). A "statement" by a witness includes any "written statement that the witness makes and signs, or otherwise adopts or approves." Fed. R. Crim. P. 26.2(f)(1).

In the context of the destruction of evidence by F.B.I. agents, the Third Circuit has held that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the appellant under the rule of

---

[1] The Jencks Act and Federal Rule of Criminal Procedure 26.2 "can be used interchangeably because Rule 26.2 incorporates the relevant provisions of the Jencks Act without any substantive change." United States v. Heilman, 377 Fed. Appx. 157, 195 (3d Cir. 2010) (internal quotation omitted).

[Brady], or the Jencks Act." United States v. Vella, 562 F.2d 275, 276 (3d Cir. 1977). The appellate court held that while the F.B.I.'s destruction of the interview notes amounted to only harmless error, the Government nonetheless had a duty to preserve the documents in case they did in fact constitute Jencks material. Id. The Third Circuit has affirmed this rule and extended it to cover draft reports by agents. See United States v. Ammar, 714 F.2d 238, 259 (3d Cir. 1983) ("the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced").

      Here the Court is presented with a similar quandary as in Vella and Ammar. When a document is destroyed or otherwise unavailable, the court is left to speculate whether its contents constituted a "statement" relevant "to the subject matter of the witness's testimony" and whether the document was ever even in the "possession" of the Government. But, regardless of the content of the text messages, the Court can at least be certain here that the agents and the cooperating witness each adopted and approved each message they sent when they affirmatively chose to transmit it. Thus, the Court deems the text messages "statements" under the Jencks Act.

      As to the content of the text messages sent between the agents and the cooperating witness, Agent Waldie testified that while his communications typically concerned the logistics of the cooperating witness's meetings with Defendants, he also gave "instructions" to the witness. (Hr'g. Tr. 6.25:15-6.26:3.) The agent testified that he encouraged the witness to be "blatant" and to "dirty up the money," meaning that the agent encouraged the witness to make it clear to Defendants that he intended to offer them a bribe. (Id. at 6.25:20, 627:21.) While each agent maintained that none of the cooperating witness's text messages to them contained any

information that he believed to be exculpatory, what the cooperating witness may have said to the agents during the crucial meetings and whether he abided by the agents' instructions are fertile ground for cross examination. (Id. at 6.11:19-23, 6.49:20-6.50:3, 6.99:22-24.) For example, the cooperating witness testified at trial that "[i]t was very infrequent, if at all, that [he] actually texted an agent" and that he would typically only send text messages to agents when "safety issues" arose or "before the payment went down." (Trial Tr. 6.161:14-6.162:20.) This testimony is belied by telephone records produced at the text message hearing, and the cooperating witness could have been further impeached on cross examination by recitation of the cooperating witness's actual text messages, had such messages been preserved. (Hr'g. Ex. 1, 2.) The need for effective cross examination of Government witnesses lies at the heart of the Jencks Act and echoes the concerns expressed in Vella and Ammar. Thus, the content of the text messages sent by the cooperating witness to the agents, and the agents' response or instructions thereto, relate "to the subject matter of the witness's testimony."

   Informational technology specialists from the F.B.I. testified regarding two theories as to why the missing text messages between the agents and the cooperating witness were not recovered. Mr. Summers, the Information Technology Unit Chief, offered the following two theories: 1) that the messages were deleted from the F.B.I. servers after 90 days pursuant to the agency's destruction policy, or 2) that the messages never reached the F.B.I. servers. (Hr'g. Tr. 7.37:19-7.38:21.) Thus, under the first theory, the F.B.I. was in "possession" of the messages both while they existed on the agents' handheld devices and for the approximately 90 days that they resided on the F.B.I. servers. Under the second theory, the F.B.I. was only in "possession" of the messages while they existed on the agents' handheld devices. In both scenarios, the

messages existed on the F.B.I. handheld devices until the agents manually deleted them. Each agent testified that he intentionally deleted the messages in order to free space in the phone's memory and not pursuant to any destruction policy. Indeed, neither the agents nor the specialists in charge of maintaining the F.B.I. servers were under any sort of directive to maintain the text messages in anticipation that criminal charges would be filed against Defendants.

The F.B.I.'s own "Corporate Policy Directive" in fact anticipates this sort of "litigation hold" on its document destruction policy. It states that the F.B.I. policy that a "full data backup will be retained for 90 days" does not apply "in cases of reasonably anticipated or pending litigation." (Hr'g. Ex. 3.) Thus, the F.B.I. appears to have been well-equipped to preserve documents relevant to this litigation had the United States Attorneys' Office requested it do so. This is especially important in the context of the case at bar, where the investigation was undertaken as a joint operation by the New Jersey United States Attorneys' Office and the F.B.I., and the United States Attorney was aware of the importance of preserving documents relevant to the litigation and could have requested a litigation hold on the text messages from the inception of the investigation.

That request, however, did not come until January of 2010–seven months after the investigation concluded and three months after the F.B.I. began searching its servers for the missing text messages. Without an appropriately timed litigation hold, the Court is left to speculate as to the contents of the missing text messages and to entertain various theories as to the cause of their disappearance. However, it is without dispute that each missing text message at one time resided on an F.B.I. agent's handheld device. It is also clear that the United States Attorneys supervising the investigation were aware that text messaging was being used by the

cooperating witness, as such use was evident on the videos. These text messages were indisputably in the Government's "possession" at one time. Thus, given the F.B.I.'s analogous preservation duty under Vella and Ammar and the failure of the Government to preserve relevant data in the midst of an ongoing investigation specifically aimed at prosecution, and thus where litigation was reasonably anticipated, the Government had a duty to preserve the Jencks material contained in the text messages.

B.  Appropriate Sanction for the Destruction of Jencks Material

Rule 26.2(e) provides that "[i]f a party who called a witness disobeys an order to produce or deliver [Jencks material], the court must strike the witness's testimony from the record," and further "[i]f an attorney for the government disobeys the order, the court must declare a mistrial if justice so requires." Fed. R. Crim. P. 26.2(e). The Rule thus specifies potentially severe sanctions for disobedience of a court order to produce Jencks material. The Rule does not, however, mandate any particular sanction against parties who destroy Jencks material outside the presence of a court order.

Defendants first request that the testimony of the cooperating witness and all tape recordings in which he is a party be suppressed. In United States v. Ramos, the Third Circuit addressed whether the destruction of rough interview notes, as in Vella, warranted suppression of related evidence. The Court reasoned that "the mere fact that Vella and Ammar each established rules for the government to follow does not suggest that we intended the automatic suppression of evidence when those rules are violated." 27 F.3d at 69. Instead, the Court applied a "good faith" test to determine whether suppression is warranted under the Jencks Act. Id. (citing Arizona v. Youngblood, 488 U.S. 51, 109 (1988)). Here, Defendants have presented little

evidence, and the Court does not find, that the Government lost or destroyed the text messages in bad faith or that the text messages clearly contained exculpatory evidence. Accordingly, suppression of evidence related to the cooperating witness is not warranted, and to the extent that Defendants move for such sanctions such request is denied.

Defendants alternatively request that the Court give an adverse inference instruction to the jury regarding the missing text messages. Since the facts of this case lie outside of the mandates of Rule 26.2(e), the Court has discretion to apply alternative sanctions. See United States v. Jackson, 649 F.2d 967, 972 n.6 (3d Cir. 1981) ("it has been held that the statutory alternatives of striking the witness' testimony or declaring a mistrial are not mandatory, and whether to follow a different course rests with the discretion of the trial judge"); United States v. Ferber, 1991 WL 16751, at *6 (E.D. Pa. 1991) ("where the Jencks Act is violated through oversight or negligence not amounting to a conscious election, the Court is entitled to apply such a remedy as the justice of the case might require under the circumstances") (internal quotations omitted). Given the relatively little criminal case law in the Third Circuit regarding the application of adverse inference instructions based on spoliation of evidence,[2] the Court consults the more thoroughly developed civil case law on the subject. See United States v. Bunty, 617 F. Supp. 2d 359 (E.D. Pa. 2008) (using the civil standard to select a spoliation sanction in a criminal case).

The key considerations for determining the appropriate spoliation sanction (e.g.,

---

[2]The most factually similar criminal case that the Court has found is United States v. Fleming, 818 F. Supp. 845, 851 (E.D. Pa. 1993), in which the district court refused to give the jury an adverse inference instruction where two witnesses had destroyed evidence before they began cooperating with the Government. Since the destruction occurred before cooperation began, Fleming provides little guidance here.

dismissal, suppression, fines, or an adverse inference instruction) are:

(1) The degree of fault of the party who altered or destroyed the evidence;

(2) The degree of prejudice suffered by the opposing party; and

(3) Whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).

In this case there is little evidence to suggest that the Government acted in bad faith in destroying the text messages. There is, however, evidence that indicates that the defense is in fact prejudiced by the loss of this evidence. The credibility of the cooperating witness and his interpretation of what was transpiring and being said at the meetings with the defendants herein is of paramount importance, and the text messages would have enabled the defense to conduct a more effective and thorough cross examination of the cooperating witness. The Court, having already concluded that the relatively severe sanction of suppression is not warranted in this case, agrees with Defendants that the "lesser sanction" of an adverse inference instruction is appropriate, considering the Schmid factors. The Court finds the adverse inference instruction appropriate because:

(1) The text messages were within the Government's control;

(2) The text messages were intentionally deleted by the agents, and the U.S. Attorneys' Office failed to take steps to preserve them;

(3) The text messages that were deleted or not preserved were relevant to claims or defenses; and

(4) It was reasonably foreseeable by the Government that in the context of this investigation and in light of the actions of the cooperating witness the text messages would later have been discoverable.

These findings by the Court fall squarely within the four elements set forth in Mosaid Technologies Inc. v. Samsung Electronics Co., 348 F. Supp. 2d 332 (D.N.J. 2004). Under Mosaid, the Court may only give an adverse inference instruction based on spoliation if the following elements are satisfied:

(1) The evidence in question must be within the party's control;

(2) It must appear that there has been actual suppression or withholding of the evidence;

(3) The evidence destroyed or withheld was relevant to claims or defenses; and

(4) It was reasonably foreseeable that the evidence would later be discoverable.

348 F. Supp. 2d at 336.

As to the first element, the Court has already addressed the extent to which the text messages were within the Government's "control." Even if the messages never found their way to the F.B.I. servers, they persisted on the agents' handheld devices until the agents deleted them. Thus, the text messages were within the Government's "control."

As to the second element, the key inquiry is the meaning of "actual suppression." The Third Circuit has explained that "[n]o unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995). In Mosaid, the district court directly addressed whether the "actual suppression" requirement implies a requirement of bad faith. 348 F. Supp. 2d 332. After a thorough analysis of Third Circuit case law in light of the spoliation inference's "remedial function" of "leveling the playing field after a party has destroyed or withheld relevant

evidence," the court in <u>Mosaid</u> adopted a "flexible approach," which takes into account both the culpability of the offending party and the prejudice to the innocent party. <u>Id.</u> at 337-38. It explained that cases will arise in which "the offending party's culpability is largely irrelevant as it cannot be denied that the opposing party has been prejudiced." <u>Id.</u> The Court finds this flexible approach particularly persuasive in light of the complementary flexibility that the Court maintains to tailor jury instructions to the needs of specific cases. <u>See</u> <u>Pension Comm. v. Banc of Am. Sec.</u>, 685 F. Supp. 2d 456, 470-71 (S.D.N.Y. 2010) (categorizing different forms of adverse inference instructions based on the severity of the offending party's misconduct).

       In this case there is little evidence to suggest that the Government acted in bad faith in destroying the text messages. The most that can be said is that the Government failed to instruct the F.B.I.–and the F.B.I. failed independently to recognize the need–to preserve potential Jencks material in anticipation of bringing criminal charges against Defendants. Nonetheless, the prejudicial effect of this failure cannot be ignored. Defendants are now without cross examination material that could be used to thoroughly test the credibility of the cooperating witness and determine whether the cooperating witness actually did or did not follow the instructions given in the F.B.I. agents' text messages, or whether the interpretation that the witness gave in the text messages as to what was said at the meetings was or was not at odds with the interpretation that the witness gave at trial. Thus, while the culpability of the Government at worst falls within the realm of gross negligence, the prejudice to Defendants is clear. The Court therefore finds "actual suppression or withholding" of the text messages by the Government under the flexible approach set forth in <u>Mosaid</u>.

       As to the third element, the Court must determine whether the destroyed evidence was

relevant to the claims and defenses in this case. Thorough cross examination of government cooperating witnesses is vital to a defendant's presentation of his or her case. Evidence relevant to cross examination is therefore likewise relevant to the defendant's case. Thus, the destroyed evidence here is "relevant to claims or defenses" in this case.

Finally, as to the fourth element, the Court must address whether "it was reasonably foreseeable that the evidence would later be discoverable." Mosaid, 348 F. Supp. 2d at 336. Here, the Government used the cooperating witness in a joint investigation with the F.B.I. to gather evidence of alleged public corruption throughout New Jersey. Indeed, the cooperating witness, who is often seen text messaging on the videos of his meetings with Defendants, was the prosecution's key trial witness and was cooperating in the investigation by virtue of a plea and cooperation agreement. Thus, the Government must have foreseen that any defense attorney viewing the same videos that the Government was privy to would seek discovery of the text messages and that the messages were therefore a potential source of Jencks material. The Court thus concludes that it is at least "reasonably foreseeable" that communications between the cooperating witness and the Government agents instructing him during the investigation would be discoverable in this case.

Having concluded that an adverse inference instruction is warranted in this case, the Court now addresses how the instruction should be phrased. In Pension Committee v. Banc of America Securities, the court delineated three levels of adverse inference instruction, differing in severity based on the nature of the spoliating party's conduct. 685 F. Supp. 2d at 470. The court explained:

In its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury

> can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level, when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption. Even a mandatory <u>presumption</u>, however, is considered to be rebuttable.
>
> The least harsh instruction <u>permits</u> (but does not require) a jury to <u>presume</u> that the lost evidence is both relevant and favorable to the innocent party. If it makes this presumption, the spoliating party's rebuttal evidence must then be considered by the jury, which must then decide whether to draw an adverse inference against the spoliating party. This sanction still benefits the innocent party in that it allows the jury to consider both the misconduct of the spoliating party as well as proof of prejudice to the innocent party. Such a charge should be termed a "spoliation charge" to distinguish it from a charge where the a jury is <u>directed</u> to presume, albeit still subject to rebuttal, that the missing evidence would have been favorable to the innocent party, and from a charge where the jury is <u>directed</u> to deem certain facts admitted.

<u>Id.</u> at 470-71 (emphasis in original).

As already discussed, the <u>Banc of America</u> approach complements the flexible analysis advocated in <u>Mosaid</u>. Not only is the culpability of the spoliating party relevant to selecting an appropriate adverse inference instruction, so is the resulting prejudice to the innocent party. Given the lack of evidence suggesting bad faith on the part of the Government and in light of the particular circumstances of this case, the Court deems the least harsh, "spoliation charge" most appropriate. At the close of evidence, the Court will issue the following charge to the jury:

> During the course of this trial you have heard evidence by way of stipulation and testimony that during the Government's investigation of Defendants, the cooperating witness, Solomon Dwek, exchanged numerous text messages with F.B.I. agents supervising the investigation. The Government was obligated to preserve all of these text messages, but they were either deleted by the agents themselves or not preserved by the Government. Specifically, although some text messages were in fact preserved, the Government failed to preserve other text messages, which pertained to Agent Russ and Agent McCarthy, from two key time periods: March 1 through March 16, 2009 and the entire month of July 2009. You may infer from the Government's failure to preserve these messages, or the fact that they were deleted by agents, that the missing text messages were relevant to this case and that they were favorable to both Defendant Suarez and Defendant Tabbachino. You are not required to make this inference, however, and you must consider any rebuttal evidence that has been offered by the

>Government with regard to this issue. Whether you ultimately choose to make the inference is your decision as the finder of fact.

## IV. Conclusion

>For the foregoing reasons, the Court grants in part and denies in part Defendant's Motion.

An appropriate Order accompanies this Opinion.


DATED: October 19, 2010            /s/ Jose L. Linares
                                                 JOSE L. LINARES
                                                 UNITED STATES DISTRICT JUDGE